UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

BROTHERS OF THE WHEEL M.C.
EXECUTIVE COUNCIL, INC.,

      Plaintiff,

v.                                    Case No. 2:11-cv-00104

GERALD R. MOLLOHAN and
JOHN DOES 1 through 50,

      Defendants.

PROPOSED FINDING AND RECOMMENDATION

Pending before the Court are the motions to dismiss [ECF Nos. 5, 13, 20, & 26] filed by defendant Gerald R. Mollohan (hereinafter "the defendant"), the plaintiff's motion for default judgment [ECF No. 14] and the defendant's motion to deny plaintiff's motion for default judgment [ECF No. 15], the plaintiff's motion for summary judgment and permanent injunction [ECF No. 17], and the defendant's motion for court injunction(s) [ECF No. 24].

FACTUAL BACKGROUND

The instant civil action was filed on February 15, 2011. In its Complaint, ECF No. 1, the plaintiff alleges various violations of federal and state trademark law by the defendant, and requests an injunction against such behavior and an award of damages. The following facts come from the plaintiff's Complaint, motion for summary judgment, and various exhibits attached to those filings, as the defendant, who is proceeding pro se, has largely presented

no factual information of his own.

The plaintiff is a motorcycle club that first began in 1977 and has since incorporated.  It currently has chapters in West Virginia, Ohio, and Kentucky.  It states that its activities include self-promotional activities, promotion of motorcycle safety, fund-raising for charities, and recreational rides for its members; according to its Complaint, the plaintiff raises at least $150,000 per year for various charities.  The plaintiff also states that it is an American Motorcyclist Association ("AMA") motorcycle club; this is an important distinction, as the plaintiff notes that the law enforcement community generally views non-AMA motorcycle clubs as outlaw motorcycle gangs.

The plaintiff states that it has engaged in substantially exclusive and continuous use of the words "Brothers of the Wheel" and its composite marks for the motorcycle club since 1977, and that it has used its mark continuously since 1977.  It applied for trademark registration on August 7, 2003, for its logo and patch. On February 15, 2005, the United States Patent and Trademark Office ("USPTO") formally issued to Brothers of the Wheel M.C. Executive Council, Inc. the mark and assigned Registration Number: 2926222. The trademark protects the name "Brothers of the Wheel M.C." and the logo of the organization.

The By-laws of the plaintiff provide that the club retains ownership of the trademark-protected patch and items and licenses

2

or gives permission to members and retirees to use the protected items.  See generally ECF No. 1, ex. 3 (the plaintiff's respective bylaws for the years 2000 and 2010).

The defendant was formerly a full member of the plaintiff.  In accordance with the plaintiff's By-laws, as a member he apparently received permission to use the plaintiff's trademarked materials and agreed to follow the By-laws as a condition of his membership. The defendant retired from the plaintiff in the year 2000 and was given permission to use the trademarked protected items on a limited basis, again in accordance with the By-laws of the club.

At some point following his retirement from the plaintiff, the defendant started his own motorcycle club, which he named "Brothers of the Wheel Nomads."  The plaintiff claims that the defendant has been using the initials "BOTW" and the Brothers of the Wheel mark in derogation of his license to use the protected items and in violation of the Federal laws protecting trademarks.  The defendant's use of the term "Nomads" is also particularly displeasing to the plaintiff, as within the motorcycle community that word refers to "outlaw" motorcycle clubs/gangs and enforcers unaffiliated with any specific motorcycle club chapter.

3

The plaintiff's trademarked logo:



ECF No. 1, ex. 2 at 1.  On the left side of the eagle is a battle-axe, and an American flag is on the right side.  As used by the plaintiff in its patches, the outer circle containing "Brothers of the Wheel M.C." has a white background, and the inner circle has a yellow background; the border that is in between the two consists of orange-colored chain links.  See Trademark Documents for USPTO Registration No. 2926222, Section 8 and 15 filing of January 11, 2011, at 3.[1]

The logo used by the defendant:



---

[1] Available at
http://tdr.uspto.gov/jsp/DocumentViewPage.jsp?2926222/81520110112
124138/Section%208%20and%2015/4/11-Jan-2011/rn/false#p=3.

ECF No. 1, ex. 5 at 6.   On the left side of the eagle is an American flag, and a battle-axe is on the right side.   The defendant's logo has a all-yellow background; the border that is in between the inner and outer circles consists of black-colored chain links.   See, e.g., Trademark Documents for USPTO Serial No.85241480, Drawing filing of February 14, 2011.[2]

The defendant has apparently been using the mark in conjunction with several web sites.   The plaintiff's motion for summary judgment states that the defendant is using its marks on a Myspace.com profile.   An exhibit to its complaint, ECF No. 1 at ex. 5, contains a print-out from profiles on Myspace and Linkedin.com that use the plaintiff's marks.   The Myspace profile is named "Brothers of the Wheel Motorcycle Club," with the internet address "www.myspace.com/brothersofthewheelmc."   Id. at 4.   As provided in the plaintiff's exhibit, the defendant's profile on the Linkedin social networking site describes him, inter alia, as the "National & International Chapter Organizer/Recruiter" for "Brothers of the Wheel MC Nomads."   This profile has the internet address www.linkedin.com/jerrymollohon.   Id. at 1-4.   This exhibit also contains the internet addresses to other websites where the defendant's version of the plaintiff's mark appears.

• http://www.facebook.com/shep.botw?sk=info (link inoperative)

---

[2] Available at
http://tdr.uspto.gov/jsp/DocumentViewPage.jsp?85241480/DRW2011021
7073216/Drawing/1/14-Feb-2011/sn/false#p=1

- http://www.myspace.com/chewybotw (this is apparently the personal Myspace profile of the defendant, as his nickname is "Chewy," see ECF No. 1 at ex. 4, 1; the profile photograph consists of the defendant's version of the plaintiff's mark)

- http://tweetree.com/api/user_timeline/Chewybotw?page=1 (apparently a rendition of the defendant's Twitter profile; it contains several photos and graphics containing the defendant's version of the plaintiff's mark)

- http://www.facebook.com/posted.php?id=134419833236569 (inoperative)

- http://km-kh.hi5.com/friend/p497709801--Chewy_BOTW%20MC%20No mad--html (an apparent social network profile with the title "Chewy BOTW MC Nomad"

- http://www.leatherneck.com/forums/member.php?u=15048 (the defendant's apparent profile on a social network website intended for United States Marine Corps veterans; the profile lists the last name "BOTW MC Nomad," and contains assorted photographs that contain, in part, the defendant's version of the plaintiff's mark.

The plaintiff's exhibit also includes the internet address http://twitter.com/Chewybotw, which is apparently the defendant's profile on the social network Twitter. This profile contains the description "BROTHERS OF THE WHEEL M.C., INC. ~ INCORPORATED IN WASHINGTON & WEST VIRGINIA, U.S.A. ~ ORGANIZING IN MEXICO & GERMANY

~" (caps and italics in original), and images containing the defendant's alleged rendition of the plaintiff's logo.

The Twitter profile contains a link to http://www.wix.com/botwnomads/brothersofthewheelmcinc, described via footnote.[3] When the undersigned examined this Twitter account, it contained "tweets" frequently involving the defendant's version of the Brothers of the Wheel, as demonstrated by the below samples:

• Tweet of October 15, 2011: "BROTHERS OF THE WHEEL M/C LOS ANGELES NOW ORGANIZING IN VENICE BEACH (have contact there for those wanting more details: [redacted])"[4]

• Tweet of October 12, 2011: "BOTW M/C NOMADS CHAPTERS IN ARIZONA, NEVADA, UTAH - now organizing ([redacted]) Group on fb For Details or e-mail [redacted]"[5]

• Tweet of October 12, 2011: "BOTW M/C COAL MINER CHAPTERS NOW ORGANIZING ....[redacted]
http://botwmcnomadcoalminers.moonfruit.com/#"[6]

• Tweet of September 26, 2011: "BROTHERS OF THE WHEEL BOONE COUNTY & BROTHERS OF THE WHEEL KANAWHA COUNTY added on

---

[3]  This link consists as a website for "Brothers of the Wheel M.C., Inc."; it contains the defendant's alleged use of the plaintiff's logo, and contains the description "INCORPORATED IN THE USA WASHINGTON & WEST VIRGINIA, WITH MEMBERSHIP WORLD-WIDE."

[4]http://twitter.com/#!/Chewybotw/status/125389576931000321

[5]http://twitter.com/#!/Chewybotw/status/124312390505480192

[6]http://twitter.com/#!/Chewybotw/status/124115135609573377

facebook by BOTW M/C NOMADS ~post your pictures~"[7]

• Tweet of September 22, 2011: "Brothers of the Wheel Manzanillo, Colima - Now organizing (hermanos de la rueda de Manzanillo, Colina - ahora la organización)"[8]

• Tweet of September 20, 2011: "BROTHERS OF THE WHEEL MC NOMADS CHAPTER NOW ORGANIZING IN GERMANY ~ INTERESTED INDIVIDUALS SHOULD CONTACT: [redacted]"[9]

Exhibit 5 to the plaintiff's Complaint also includes email correspondence between the plaintiff and Mr. Bobby Brown of Aurora, Colorado.  Mr. Brown had emailed the plaintiff on January 31, 2011:

> I received some information through Linked In that you were accepting members into your Nomads Chapter.  Is this correct and if so where do I need to go from here?  I really believe strongly in your philosophy and being from Morgantown originally, I am strongly drawn to your organization[.]

ECF No. 1, ex. 5 at 5.  The plaintiff responded:

> I'm sorry to say you have been misinformed. Although the BOTW MC is taking in new members, we have no Nomad chapter.  There is however a former member using our name to try to start his own club.  We are in the process of taking legal action to stop him from using our trademarks.  I regret you have been put in the middle of this situation, but the truth is the "BOTW Nomad Chapter" exists mostly in one persons confused mind and on the internet. If you ever get back closer to the east coast feel free to come see us.

Id.  Mr. Brown then replied, "[t]hank you very much for the

---

[7] http://twitter.com/#!/Chewybotw/status/118501715497590784

[8] http://twitter.com/#!/Chewybotw/status/116835042801623040

[9] http://twitter.com/#!/Chewybotw/status/116125905901985792

clarification and I completely understand . . . . Thanks for information and I am sorry for the sh*t you all must be dealing with over this." Id.

The plaintiff also alleges in its Complaint that the defendant is selling merchandise with its trademark, and is licensing others to use the trademark. The John Does who are also defendants in this action "are any person or persons to whom [the defendant] sold to or allowed to use the trademark protected items belonging" to the plaintiff." ECF No. 1 at 6.

The plaintiff states that it became aware of the defendant's activities in October 2010. According to the plaintiff, the defendant ignored a cease and desist letter that was sent to him, see ECF No. 1, ex. 2 at 13, and instead expanded his use of the mark. The plaintiff states that since it filed this suit, the defendant chartered a corporation which uses the plaintiff's trademark. See ECF No. 15 at 5-8.

The defendant's application to trademark a logo and name that allegedly uses the plaintiff's trademark was first rejected and refused by the USPTO on May 23, 2011. The grounds for the refusal included the likelihood of confusion with the plaintiff's trademark, and the logo's impermissible use of the American flag. Revised trademark applications by the defendant were similarly denied on these grounds by the USPTO on July 14, 2011, and August 2, 2011. On September 22, 2011, the defendant filed an updated

10

logo with the USPTO that added a battle axe in place of the American flag; however, this updated logo does not apparently contain any changes intended to address the likelihood of confusion issue, despite the fact that prior USPTO correspondence to the defendant has contained specific suggested changes that might allow for the defendant's application to be approved.[10]   In later correspondence to the USPTO that was docketed on September 29, 2011, the defendant wrote that he would address the agency's other concerns once he was notified that the battle axe change resolved the American flag issue with his logo.

The plaintiff filed the instant civil action on February 15, 2011.   Count One alleges infringement of a registered mark, in violation of Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a).   Count Two alleges false designation of origin, in

---

[10]   "Upon submitting a new drawing without the American flag, applicant will have to submit an amended description of the mark. The following is suggested:

The mark consists of four concentric circles consisting of an outer BLACK circle, a LIGHT BROWN concentric circle, another inner BLACK circle which appears around the inner most LIGHT BROWN circle;  the words BROTHERS OF THE WHEEL appear in BLACK in the outer LIGHT BROWN CIRCLE with the word BROTHERS on top side in side circle, the word "of" appears inside the circle under the right wing of the eagle and the word "the" appears inside the circle under the left wing and the word WHEEL appears inside the circle at bottom underneath the tail of the Eagle; the  Eagle is BROWN with a WHITE head which is facing left; the neck feathers and tail feathers are WHITE; A BROWN Battle Axe extends from the eagle's left talon."  USPTO office action of August 2, 2011, available at
http://tdr.uspto.gov/jsp/DocumentViewPage.jsp?85241480/OOA2011080 2102945/Offc%20Action%20Outgoing/7/02-Aug-2011/sn/false#p=1

violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Count Three alleges trademark dilution by blurring, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Count Four alleges cybersquatting, in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d). Count Five alleges an unspecified violation of West Virginia trademark law; it only cites to West Virginia Code Chapter 47, Article 2, and not a specific statutory section. Count Six requests a common law injunction restraining the defendant's activities.

The plaintiff requests various remedies in its Complaint. Along with favorable judgment on its claims, the Complaint demands, inter alia, actual or various statutory damages for the defendant's alleged violation of 15 U.S.C. § 1125(d)(1), ECF No. 1 at 13; an Order that the defendant's cancel or transfer the domain name "botw.com," id.; preliminary and permanent injunctions under 15 U.S.C. § 1116(a) enjoining the defendants, and anyone acting in concert with them, from using or imitating its mark, id. at 14; damages under 15 U.S.C. § 1117(a), id. at 14; and an Order under 15 U.S.C. § 1118 requiring that any items in the possession of the defendants that use or imitate its mark be delivered to the Court and destroyed. Id. at 15. The plaintiff requests similar relief in its motion for summary judgment and permanent injunction, see ECF No. 17 at 23-24, including demands that the defendant disclose the entity that made the items with the plaintiff's mark;

12

disclosure of the individuals who became involved with the defendant's organization, termination of any entity with the name Brothers of the Wheel-Nomads, relinquishment to the plaintiff of any monies that the defendant received from Brothers of the Wheel-Nomads, and a penalty of $1,000 per day for each violation and each day that the defendants fail to comply with the Court's judgment.

The plaintiff attached an affidavit from its national vice president, Mr. Ray E. Carey, with its motion for summary judgment and permanent injunction.  In pertinent part, the affidavit states the following:

> After being duly sworn, Ray E. Carey states:
> 1. That he is the National Vice President of Brothers of the Wheel M.C. Executive Council, Inc.
> 2. That he has been associated with the Brothers of the Wheel Motorcycle Club since 1977.
> 3. That Brothers of the Wheel M.C. Executive Council, Inc. owns the trademark, name and logo "Brothers of the Wheel" and has never and has no intention of licensing, selling or otherwise permitting Gerald Mollohan, or anyone associated with him, so defendant Mollohan and anyone associated with him will never be able to meet the primary reason for the refusal by the United States Patent and Trademark Office to register defendant's mark, which is likelihood of confusion.
> 4. Brothers of the Wheel M.C. Executive Council, Inc. was the first to use and the first and only entity to trademark the name and logo until Mollohan's infringement.
> 5. Defendant Mollohan's illegal and unauthorized infringement of the Brothers of the Wheel M.C. Executive Council, Inc.' s trademark protected items has cost the Brothers of the Wheel M.C. Executive Council, Inc. membership dues, community goodwill and services $25,000 and to date, $9,500 in attorney fees plus court costs and service of process fees.
> 6. The Brothers of the Wheel M.C. Executive Council, Inc. will continue to suffer irreparable harm, especially on the internet, unless defendant Mollohan's infringement is

13

stopped.
7. [A]ll of the members of the Brothers of the Wheel Motorcycle Club, which is operated by Brothers of the Wheel M.C. Executive Council, Inc. have worked hard for over 33 years for the club to have a positive image and to raise funds for charity.
8. The Brothers of the Wheel is neither an outlaw motorcycle club nor an outlaw motorcycle gang and aggressively seeks to obey the law and uphold its good image. The term "nomad" has a special meaning among outlaw motorcycle clubs or gangs. There is a violent outlaw motorcycle club by the name of Nomads in Australia.  In the United States, the term "nomad" is descriptive of a club "enforcer" and has no allegiance to any particular club chapter.
9. AMA and non-outlaw motorcycle clubs like the Brothers of the Wheel do not have nomads.
10. All allegations in the Complaint are true and accurate to the best of his knowledge.

ECF No. 17, ex. 1 at 1-3.

## PROCEDURAL HISTORY

The plaintiff filed its complaint on February 15, 2011.  ECF No. 1.  The defendant filed his first motion to dismiss on March 4, 2011.  ECF No. 5.  On April 21, 2011, the undersigned held a status conference in this case, where the requirements and procedures of the litigation process were explained to the defendant.  ECF No. 10.  The defendant was also ordered to file an Answer to the Complaint by May 6, 2011.  ECF No. 11.  Instead, the defendant filed a second motion to dismiss on May 5, 2011.  ECF No. 13.  This motion is nearly identical to his first motion; it only uses a different font.  On June 2, 2011, the plaintiff filed a motion for default judgment, ECF No. 14, which the defendant opposed via the "motion to deny plaintiff's motion for default judgment" that he

14

filed on June 17, 2011.  ECF No. 15.

On July 19, 2011, the plaintiff filed its motion for summary judgment and permanent injunction.  ECF No. 17.  The undersigned ordered the defendant to respond to the motion by August 5, 2011.  ECF No. 18.  This Order was issued pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and included a citation to Roseboro itself.  The defendant filed his response on August 5, 2011, ECF No. 19, and the plaintiff replied on August 10, 2011.  ECF No. 21.  The defendant filed a surreply of sorts on August 18, 2011, ECF No. 23, which he titled "Defendant's Response to Plaintiff's Motion of August 3, 2011 [*sic*] Regarding Magistrate Stanley's 'Order,'"  The defendant also filed a third motion to dismiss on August 5, 2011, ECF No. 20, and a fourth motion to dismiss on September 20, 2011.  ECF No. 26.  These two motions to dismiss are also largely identical in argument to one another.  On September 6, 2011, the defendant filed a "Motion for Court Injunction(s)," ECF No. 24, wherein he alleges harassment on the part of the plaintiffs and requests that the plaintiff and its officers and members be forbidden from communicating with the defendant and from coming within one hundred yards of the defendant.

On September 28, 2011, the undersigned issued an Order that stayed discovery and halted the filing of any additional motions until further notice.  ECF No. 29.

15

**THE DEFENDANT'S MOTIONS TO DISMISS**

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must assume "the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." Eastern Shore Markets, Inc. v. J.D. Associates Ltd. Partnership, 213 F.3d 175, 180 (4th Cir. 2000). When considering a motion to dismiss, a court "accept[s] as true all well-plead allegations and view[s] the complaint in the light most favorable to the plaintiff." Sec. of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007); see also Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir. 1991).

"[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Ashcroft v. Iqbal, --- U.S. ---, ---, 129 S. Ct. 1937, 1950 (2009). "To survive a Rule 12(b)(6) motion to dismiss, the facts alleged must be enough to raise a right to relief above the speculative level and must provide enough facts to state a claim to relief that is plausible on its face." Robinson v. Am. Honda Motor Co., Inc., 551 F.3d 218, 222 (4th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)) (internal quotations omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of

16

his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal citations omitted); see also Iqbal, --- U.S. at ---, 129 S. Ct. at 1949 (stating that "the Rule does call for sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.").

As noted earlier, the defendant has filed four separate motions to dismiss. As the defendant does not really organize his arguments as to each count, the undersigned will state the parties' arguments, then review each count separately.

The first two motions filed by the plaintiff, ECF Nos. 5 and 13, are nearly identical and differ only in font. In those motions, the defendant both disputes various facts asserted in the plaintiff's complaint, and also argues that the plaintiff has failed to allege other facts with sufficient particularity. He also argues that dismissal is warranted under the doctrine of abatement because his own trademark application is pending before the USPTO, and that therefore there is a previously filed action pending between these parties for the same cause. He also suggests that a USPTO decision on his application may moot this case. The plaintiff categorically disagrees in its response. ECF No. 6.

In his third and fourth motions to dismiss, ECF Nos. 20 and 26, the defendant raises the affirmative defense that the

registration of the plaintiff's trademark is invalid, as its depiction of an American flag is prohibited by Section 2(b) of the Lanham Act, 15 U.S.C. § 1052(b).  That provision states that

> [n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register because of its nature unless it . . . [c]onsists of or comprises the flag or coat of arms or other insignia of the United States or of any State or municipality, ... or any simulation thereof.

The plaintiff disagrees in its response.  ECF No. 27.  It argues that the USPTO would not have registered and renewed its mark if it had been illegal to do so, and that it is only the opinion of the USPTO that is relevant, and not the opinion of the defendant.  It also notes that the defendant has unsuccessfully made this argument to the USPTO in his response to that agency's denial of his own application.

**Count One**

In Count One of its Complaint, the plaintiff alleges that the defendant infringed its registered trademark.  Section 32(1) of the Lanham Act creates a cause of action against:

> [a]ny person who shall, without the consent of the registrant-(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1).  To prevail on an infringement claim, the mark holder must prove:

> (1) that it possesses a mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred "in commerce"; (4) that the [opposing party] used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the [opposing party] used the mark in a manner likely to confuse consumers.

Lamparello v. Falwell, 420 F.3d 309, 313 (4th Cir. 2005) (citing

People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359,

364 (4th Cir. 2001) (citing 15 U.S.C. §§ 1114 and 1125)).

Unlike Section 43(a) of the Lanham Act, see section on Count

Two, infra, Section 32(1) applies only to marks registered with the

USPTO.   There is no dispute that the USPTO registered the

plaintiff's mark.   Registration of a mark

> shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115 (emphasis added).   Therefore,

> The presumption which registration thus gives the mark . . . does not preclude one charged with infringement from "collaterally attack[ing]" in an infringement action, either by way of an affirmative defense or by way of a counterclaim seeking cancellation of the registration," if the mark has not become incontestable under § 1065(2) . . . . Registration, and the presumption it creates, however, as we have already observed, do, for purposes of suit, "shift the burden of proof from the plaintiff, who in a common law infringement action would have [had] to establish his right to exclusive use, to the defendant, who must introduce sufficient evidence to rebut the presumption of plaintiff's right to such [exclusive] use.

<u>Pizzeria Uno Corp. v. Temple</u>, 747 F.2d 1522, 1529 (4th Cir. 1984). <u>See also</u> <u>H. Jay Spiegel & Associates, P.C. v. Spiegel</u>, 652 F. Supp.2d 639, 647 (E.D. Va. 2009) ("Registration also does not bar Defendant from proving that the mark was improperly registered [due to a violation of 15 U.S.C. § 1052(e)(4) in that case].  If the USPTO mistakenly granted registration on the Principal Register, that mistake does not automatically hand the Plaintiff victory in this action.") (citing <u>Pizzeria Uno</u>); <u>George & Co. LLC v. Imagination Entertainment Ltd.</u>, 575 F.3d 383, 395 (4th Cir. 2009) ("And although [the defendant] had an opportunity in the district court to rebut the presumption raised by the USPTO's determination, it declined to do so.").

The plaintiff is therefore incorrect in its assertion that the defendant cannot raise the affirmative defense of registration invalidity.  While 15 U.S.C. §§ 1064 and 1067 do allow for the Trademark Trial and Appeal Board to review a petition for trademark cancellation, the Lanham Act also gives concurrent jurisdiction to this court.

> In any action involving a registered mark the court may determine the right to registration, order the cancelation [*sic*] of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action[.]

15 U.S.C. § 1119.  Moreover, the fact that the defendant raised the issue of the plaintiff's flag in his own trademark application is irrelevant, as the USPTO was not reviewing the plaintiff's mark in

that proceeding.

The plaintiff's mark clearly uses a depiction of the American flag, seemingly in contravention of 15 U.S.C. § 1052(b). However, Section 1052(b) is not as clear-cut as the defendant makes it out to be. Under USPTO guidelines, a mark that contains an American flag is not automatically in violation of that provision.

> Marks containing elements of flags in a stylized or incomplete form are not refused under §2(b). The mere presence of some significant elements of flags, such as stars and stripes (U.S. flag) or a maple leaf (Canadian flag), does not necessarily warrant a refusal.
>
> If the flag design fits one of the following scenarios, the examining attorney should not refuse registration under §2(b):
>
> • The flag design is used to form a letter, number, or design.
>
> • The flag is substantially obscured by words or designs.
>
> • The design is not in a shape normally seen in flags.
>
> • The flag design appears in a color different from that normally used in the national flag.
>
> • A significant feature is missing or changed.

U.S. Dept. of Commerce, Patent and Trademark Office, Trademark Manual of Examining Procedure ("TMEP") § 1204.01(b), p. 1200-152-53 (8th ed. October, 2011). The latter provision is applicable to the instant case. The American flag contained in the plaintiff's registered mark has significant features that are missing or changed: it has a square shape, there are no stars, and there are

less than thirteen stripes.   Due to this compliance with TMEP

Section 1204.01(b), the flag does not violate Section 1052(b).  The

USPTO's determination is also entitled to some degree of deference.

As the Fourth Circuit noted in <u>Pizzeria Uno</u>, where the issue was a

mark's level of distinctiveness,

> [t]he problem of making the proper determination of
> whether the mark is descriptive or suggestive, has caused
> a number of courts, when confronted with the problem, to
> conclude that under the circumstances it is especially
> prudent to give due respect to the determination of the
> Patent Office if the distinction [between the two ideas]
> is to be drawn in a consistent manner.  This is because
> the Patent and Trademark Office is the administrative
> agency    initially    charged    with    determining    the
> registerability of a mark or figure and in exercising
> that function it must necessarily decide whether the mark
> is descriptive or suggestive, since the Patent and
> Trademark Office may not grant registration to a mark
> which it finds to be "merely descriptive."

<u>Pizzeria Uno</u>, 747 F.2d at 1528.  <u>See also</u> <u>George & Co.</u>, 575 F.3d at

395 ("We are obligated to defer to the determination of the USPTO,

which constitutes prima facie evidence of whether a mark is

descriptive or suggestive.") (internal citation omitted).

Accordingly, as to the first element of the cause of action,

the defendant has not successfully rebutted the presumption of

validity that the plaintiff's mark obtained when it became

registered.   The mark's registration was correctly issued by the

USPTO, and the defendant's American flag argument fails.[11]

---

[11]  To the extent that the defendant disagrees with how the USPTO
determined that the American flag contained within his own mark
did not comply with TMEP Section 1204.01(b), that is an issue
between him and that agency, and is not before this Court.

The third and fourth elements of a Section 32(1) claim are, respectively, that the defendant's use of the mark occurred in commerce and that the defendant used the mark in connection with the sale, offering for sale, distribution, or advertising of goods or services.  As noted earlier, the defendant has argued that the plaintiff has failed to allege these facts with sufficient specificity.  Before addressing these elements, the undersigned will venture down the rabbit hole of the Lanham Act's commerce requirements.

15 U.S.C. § 1127 states that "unless the contrary is plainly apparent from the context ... [t]he word 'commerce' means all commerce which may lawfully be regulated by Congress."  Therefore, "commerce" under the Lanham Act "is coterminous with that commerce that Congress may regulate under the Commerce Clause." International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco, 329 F.3d 359, 364 (4th Cir. 2003); Bosley Medical Institute, Inc. v. Kremer, 403 F.3d 672, 677 (9th Cir. 2005) ("'Use in commerce'" is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause."); Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1194 (11th Cir. 2001) ("The parties do not make clear the two different contexts in which the phrase 'use in commerce' is used.  The term 'use in commerce' as used in the Lanham Act 'denotes Congress's authority under the Commerce Clause rather than an intent to limit the

23

[Lanham] Act's application to profit making activity.'") (quoting United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc., 128 F.3d 86, 92-93 (2d Cir. 1997)). See also Planned Parenthood Federation of America, Inc. v. Bucci, 42 U.S.P.Q.2d 1430, 1434 (S.D.N.Y. 1997) (Kimba Wood, J.) ("Internet users constitute a national, even international, audience, who must use interstate telephone lines to access defendant's web site on the Internet. The nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's 'in commerce' requirement."). However, "[b]ecause a mark is used in commerce only if it accompanies services rendered in commerce, i.e., it is employed appurtenant to an established business or trade that is in commerce, 'mere advertising' of that mark does not establish its protectability, though advertising is itself commerce that Congress may regulate." Societe des Bains de Mer et du Cercle des Etrangers a Monaco, 329 F.3d at 364.

Due to the broad reach of the Commerce Clause, the appropriate commerce analysis under the Lanham Act is to determine "whether [a defendant's] use was 'in connection with a sale of goods or services' rather than a 'use in commerce.'" Bosley Medical Institute, Inc., 403 F.3d at 677. The Lanham Act is also not limited to purely commercial activity.

> [T]he trademark infringement and false designation of
> origin provisions of the Lanham Act (Sections 32 and
> 43(a), respectively) do not employ the term
> "noncommercial." They do state, however, that they

24

> pertain only to the use of a mark "in connection with the
> sale, offering for sale, distribution, or advertising of
> any goods or services," 15 U.S.C. § 1114(1)(a), or "in
> connection with any goods or services," id. § 1125(a)(1).
> But courts have been reluctant to define those terms
> narrowly.  Rather, as the Second Circuit has explained,
> "[t]he term 'services' has been interpreted broadly" and
> so "[t]he Lanham Act has ... been applied to defendants
> furnishing a wide variety of non-commercial public and
> civic benefits.

Falwell, 420 F.3d at 314 (citing United We Stand Am., Inc., 128

F.3d at 89-90.  Inappropriate use of a mark can even occur when a

defendant's use of a plaintiff's mark on the internet is likely to

prevent internet users from reaching the plaintiff's actual

website; prospective users of the plaintiff's services who

mistakenly access the defendant's website may fail to continue to

search for the plaintiff's website due to anger, frustration, or

the belief that the website does not exist.  Doughney, 263 F.3d at

366 (internal citations omitted).  But see Utah Lighthouse Ministry

v. Foundation for Apologetic Information and Research, 527 F.3d

1045, 1052 (10th Cir. 2008) (declining to follow Doughney, as

"[s]uch an interpretation eliminates the requirement of an economic

competitor and is therefore inconsistent with the purpose of the

Lanham Act to protect the ability of consumers to distinguish among

competing producers . . . . [T]he defendant in a trademark

infringement and unfair competition case must use the mark in

connection with the goods or services of a competing producer, not

merely to make a comment on the trademark owner's goods or

services.  The Lanham Act addresses the specific problem of

consumer confusion about the source of goods and services created by the unauthorized use of trademarks.")

Fed. R. Civ. P. 12(b)(6) requires that a reviewing court assume the truth of all facts alleged in a Complaint. Therefore, defendant's attempts to dispute certain facts of the plaintiff's Complaint are premature.

The plaintiff has alleged facts with sufficient particularity so as to state a claim to relief that is plausible on its face. The defendant uses on the internet a name and logo for his motorcycle club that is very similar to the mark used by the plaintiff, which is also a motorcycle club. The defendant's internet activity is a use in commerce, and, as the Fourth Circuit noted in Falwell, 420 F.3d at 314, the Lanham Act applies to "non-commercial public and civic benefits," a term that is inclusive of the defendant's motorcycle club. The plaintiff has also alleged with sufficient specificity that the defendant's endeavors are confusing other members of the motorcycle community.

The defendant's abatement argument is without merit. The USPTO's continued denials of the defendant's own trademark application have not mooted this civil action, and the defendant's argument regarding the American flag contained in the plaintiff's mark is, as stated above, without merit.

In short, the allegations contained within Count One clearly fall within the type of registered trademark infringement actions

contemplated by the Lanham Act.   Therefore, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff has stated a claim for which relief can be granted.

### Count Two

Section 43(a) creates a cause of action against:

> [a]ny person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).   In Count Two of its Complaint, the plaintiff alleges false designation of origin by the defendant. ECF No. 1 at 8, para. 33.

False designation of origin has the same five elements as infringement.   Therefore, the mark holder must prove:

> (1) that it possesses a mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred "in commerce"; (4) that the [opposing party] used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the [opposing party] used the mark in a manner likely to confuse consumers.

Lamparello v. Falwell, 420 F.3d at 313 (4th Cir. 2005) (citations omitted).   Due to the fact that Sections 32(1) and 43(a) of the Lanham Act have the same elements, the caselaw and analysis applicable to Count One discussed supra is also applicable to Count

27

Two; the undersigned accordingly incorporates that analysis for Count Two, as the defendant's arguments for each of those Counts is largely identical.

The defendant's argument regarding the American flag contained in the plaintiff's mark is without merit. First, as stated above, the flag argument itself is incorrect. However, even assuming arguendo that the defendant is correct about the validity of the mark's registration, the registration status of a mark is inapplicable in an action brought under Section 43(a), as the plain language of that provision goes beyond marks registered with the USPTO. See also Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990) (Section 43(a) protects against infringement "even though the mark or name has not been federally registered."). Therefore, even if the registration of the plaintiff's mark was incorrectly granted due to the flag therein, the plaintiff has still stated a claim under Section 43(a).

In short, the allegations contained within Count Two clearly fall within the heartland of false designation of origin actions contemplated by the Lanham Act. Therefore, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff has stated a claim for which relief can be granted.

**Count Three**

Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that

impairs the distinctiveness of the famous mark," 15 U.S.C. § 1125(c)(2)(B). It may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury," 15 U.S.C. § 1125(c)(1). A "famous mark" is defined as "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). In determining whether a mark is famous, a court

> may consider all relevant factors, including the following:
> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
> (iii) The extent of actual recognition of the mark.
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Id. "This is a rigorous standard, as it extends protection only to highly distinctive marks that are well-known throughout the country." Green v. Fornario, 486 F.3d 100, 105 (3d Cir. 2007) (citing TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc., 244 F.3d 88, 99 (2d Cir. 2001) (stating "[i]t seems most unlikely that Congress intended to confer on marks that have enjoyed only brief fame in a small part of the country, or among a small segment of the population, the power to enjoin all other users throughout the nation in all realms of commerce. The examples of eligible 'famous marks' given in [the legislative history]–Dupont, Buick, and Kodak

29

. . . –are marks that for the major part of the century have been household words throughout the United States. They are representative of the best known marks in commerce."). <u>See also</u> <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 105 (2d Cir. 2009) (noting, in a civil action challenging the defendant's sale of "Charbucks" coffee, that "[s]ome classic examples of blurring include hypothetical anomalies as Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth.").

The plaintiff has provided the Court with no information, data, or statistics demonstrating that its mark is widely recognized by the general consuming public of the United States to the same extent as the national brands listed above. The plaintiff has therefore failed to allege facts with sufficient detail and specificity. Therefore, the undersigned proposes that the presiding District Judge **FIND** that, as currently written, the plaintiff's Complaint fails to allege the essential element of possessing a famous mark, which is required for the plaintiff to obtain relief as to Count Three.

### <u>Count Four</u>

The Anticybersquatting Consumer Protection Act ("ACPA") was enacted in 1999 with the purpose of addressing the problem of "[c]yberpiracy (or cybersquatting), [which] consists of registering, trafficking in, or using domain names (Internet

addresses) that are identical or confusingly similar to trademarks with the bad-faith intent to profit from the goodwill of the trademarks." H.R. Rep. No. 106-412, at 8 (1999).

The ACPA provides that a person shall be liable in a civil action by the owner of a mark, if, without regard to the goods or services of the parties, that person (i) has a bad faith intent to profit from that mark and (ii) registers, traffics in, or uses a domain name that is identical or confusingly similar to that mark. Retail Servs. Inc. v. Freebies Publ'q, 364 F.3d 535, 549 (4th Cir. 2004) (citing and quoting 15 U.S.C. § 1125(d)(1)(A)). See also Falwell, 420 F.3d at 318 ("To prevail on a cybersquatting claim, Reverend Falwell must show that Lamparello: (1) 'had a bad faith intent to profit from using the [www.fallwell.com] domain name,' and (2) the domain name www.fallwell.com 'is identical or confusingly similar to, or dilutive of, the distinctive and famous [Falwell] mark.'").

A "domain name" is "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." 15 U.S.C. § 1127. In other words, a domain name is the "___.com" or "___.org" of an internet address; it is not the individual pages or profiles within a "___.com" or "___.org." See H.R. Rep. No. 106-412, at 6 ("Owners of famous trademarks typically register their trademarks as domain

31

names (such as 'microsoft.com').").

Accepting the plaintiff's claims as true, the defendant has used the plaintiff's mark in a large and varied presence on the internet.   However, the multitude of websites cited by the plaintiff do not fall within the coverage of Section 1125(d)(1)(A). The defendant has not used the plaintiff's mark in a domain name, as the term is defined under the statute and illustrated above. Rather, he has used the plaintiff's mark as part of his profiles on social network websites and as a part of his personal sections of other websites.   Take, for example, the Myspace page used by the defendant, www.myspace.com/brothersofthewheelmc.  "Myspace.com" is the actual domain name; "brothersofthewheelmc" is only the identifier of the defendant's profile on Myspace-it is not the domain name itself.

The plaintiff has not sufficiently pled that the defendant has registered, trafficked in, or used an actual domain name that uses or imitates the plaintiff's mark.   The undersigned notes, however, that this does not mean that the plaintiff is without remedies as to the defendant's actions on the internet, as such actions are still encompassed by its claims in Count One and Two.

Therefore, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to state a claim for which relief can be granted as to Count Four.

**Counts Five and Six**

Count Five alleges an unspecified violation of West Virginia trademark law; it only cites to West Virginia Code Chapter 47, Article 2, and not a specific statutory section.  The undersigned cannot determine what specific violation of West Virginia law is being alleged.   Count Six requests a common law injunction restraining the defendant's activities.  It provides no details as to which area or specific theory of common law that the plaintiff is invoking.   Therefore, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to state claims for which relief can be granted as to Counts Five and Six.

**THE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT & THE DEFENDANT'S MOTION TO DENY PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

In its motion for default judgment, ECF No. 14, the plaintiff argues that default judgment is merited because the defendant failed to file an Answer with the Court by the May 6, 2011, deadline, and instead filed his second motion to dismiss.  The defendant opposes this motion in his response, which he styled as a motion to deny that motion, ECF No. 15, and was docketed by the Clerk of the Court as such.  He asserts, <u>inter alia</u>, that he was merely following the Court's instructions.

Rule 12(a)(4) provides that when a motion to dismiss is filed, a defendant must serve a responsive pleading within fourteen days

33

of the motion being denied.  Entry of default is inappropriate in this case as motions to dismiss are pending.  Moreover, because the defendant is proceeding <u>pro</u> <u>se</u>, the undersigned, out of an abundance of caution, will construe the defendant's motions to dismiss as responsive pleadings to the extent that they deny the allegations contained in the Complaint; the defendant notes that he was attempting in his motions to answer the allegations against him.  <u>See</u> ECF No. 15 at 4.[12]

**THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

Entry of summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Instead, the Court

---

[12]  In his motion to deny the plaintiff's motion for default judgment, the defendant also makes several requests, including one for discovery, that are inappropriate.  These requests should be denied.

will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986). However, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." <u>Anderson</u>, 477 U.S. at 256.

The plaintiff's motion for summary judgment and permanent injunction is structured in a somewhat unorganized manner. It does not discuss the absence of a genuine issue of material fact as to the individual counts of the plaintiff's Complaint. Rather, it focuses primarily on its claim that the defendant violated federal trademark laws, and argues that an injunction, along with other remedies, is warranted.

The defendant's response to the plaintiff's motion was titled "Defendant's Response to Plaintiff's Motion of August 3, 2011 [*sic*] Regarding Magistrate Stanley's 'Order.'" ECF No. 23. In that filing, the defendant does not address the merits of the plaintiff's case. However, he does argue that he should not be required to fully respond because doing so would be considered discovery. He also states that he has repeatedly notified the USPTO about the plaintiff's impermissible flag, and that this action would be rendered moot if the USPTO acts against the registration of the plaintiff's mark.

In response to these assertions, the plaintiff, <u>inter alia</u>,

35

describes this filing by the plaintiff as "spurious," and notes that the defendant has not refuted or controverted the merits of the plaintiff's case.  ECF No. 21.

The defendant replied to these arguments by reiterating that the plaintiff's mark contains a prohibited American flag, and arguing that this case should not move forward until the USPTO reevaluates the plaintiff's registration.  ECF No. 23

The defendant's arguments are indeed spurious.  As noted earlier, the flag contained within the plaintiff's mark does not violate USPTO guidelines.  Moreover, even if it did, unregistered marks are protected under Section 43(a).  Accordingly, for the purpose of determining whether summary judgment is appropriate in this case, the undersigned will now consider the merits of the plaintiff's case, and will address the issue of remedies in a separate section.

**Count One**

As stated earlier, to prevail on an infringement claim, the mark holder must prove:

(1) that it possesses a mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred "in commerce"; (4) that the [opposing party] used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the [opposing party] used the mark in a manner likely to confuse consumers.

Lamparello v. Falwell, 420 F.3d at 313.

36

## The Plaintiff's Possession of a Mark

Under 15 U.S.C. § 1057(b), a certificate of registration of a mark serves as prima facie evidence that the mark's registrant owns the registered mark, has properly registered it under the Lanham Act, and is entitled to its exclusive use in commerce.  Georgia Pacific Consumer Products, LP v. Von Drehle Corp., 618 F.3d 441, 452 (4th Cir. 2010) (internal citation and quotation omitted).  Therefore, under 15 U.S.C. § 1115(a), "registration creates a presumption of the registrant's ownership of the mark, subject to any applicable legal or equitable defenses or defects."  Id. (internal citations omitted).  However, federal registration of a mark does not guarantee ownership rights in the mark; rights in a registered mark are acquired through actual use, just as for unregistered marks.  Emergency One, Inc. v. American Fire Eagle Engine Co., Inc., 332 F.3d 264, 267 n.1 (4th Cir. 2003).

The defendant has presented no evidence to rebut the presumption that the plaintiff owns its mark and possesses a protectable interest.  The defendant's main challenge, the American flag argument, is unsuccessful.  The plaintiff also asserts that its ownership of the mark is "beyond fair dispute."  ECF No. 17 at 13.

> The Brothers of the Wheel M.C. Executive Council, Inc. was the first to apply for federal registration for their mark, and it is indisputable that The Brothers of the Wheel M.C. Executive Council, Inc. was the first to use the mark "Brothers of the Wheel" and associated logo in interstate commerce in association with its services and

37

activities . . . . Thus, as shown by the accompanying declaration of Ray E. Carey, The Brothers of the Wheel M. C. Executive Council, Inc. started using the name "Brothers of the Wheel" and associated mark in interstate commerce in 1977 and has used it continuously since that time, trademarking it in 2005. The mark was later used as the title and domain name of the Brothers of the Wheel website starting in 2003, and has been used since that time to promote and provide the Brothers of the Wheel Motorcycle Club.

Id. at 13-14.

The defendant does not address this question in his response to the plaintiff's motion for summary judgment. However, the undersigned notes that, as demonstrated by exhibits that he attached to his first motion to dismiss, the defendant registered his club with the State of Washington as a non-profit or charitable organization as far back as 2001 and 2002, dates that precede the plaintiff's registration with the USPTO. ECF No. 5 at ex. 2. Accordingly, the undersigned will consider these exhibits, inasmuch as the defendant is proceeding pro se. However, such registration with the State of Washington does not change the outcome of this matter, inasmuch as the plaintiff has uncontestedly been using its mark since 1977.

Therefore, there is no genuine issue of material fact that the plaintiff possesses the mark in question.

### The defendant's use of the mark

The defendant does not contest, nor can he, that his motorcycle club uses the plaintiff's word mark, and that his logo is very similar. He even admits as such in his first motion to

38

dismiss, where he concedes that "[i]t may be true that there are some similarities in the two marks," before arguing that there could still be no confusion between the two.  ECF No. 5 at 2.  He then addds that "it is only normal that he would consider at least some of the characteristics of the logo from his former club."  <u>Id.</u>

Accordingly, there is no genuine issue of material fact that the defendant uses the plaintiff's mark.

### The defendant's use of the mark "in commerce"

Due to his uncontested use of the mark on the internet, there is no genuine issue of material fact that the defendant used the plaintiff's mark "in commerce."

### The defendant's use of the mark in connection with the sale, offering for sale, distribution, or advertising of goods or services

The defendant has used the mark in connection with his own motorcycle club-namely, a club that, with the exception of the additional word "nomads," has a name that is identical to the plaintiff's mark.  As the Fourth Circuit noted in <u>Falwell</u>, 420 F.3d at 314, the Lanham Act applies to "non-commercial public and civic benefits," a term that is inclusive of the defendant's motorcycle club.  The defendant has presented no evidence to the contrary, and there is no genuine issue of material fact as to this element.

### Likelihood of Confusion

The final element in an infringement claim is the likelihood

of confusion.  "Likelihood of confusion exists if 'the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question.'" CareFirst of Maryland, Inc. v. First Care, P.C., 434 F.3d 263, 267 (4th Cir. 2006) (quoting KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 117 (2004).

> In conducting the likelihood-of-confusion analysis, a court does not indulge in a prolonged and minute comparison of the conflicting marks in the peace and quiet of judicial chambers, for this is not the context in which purchasers are faced with the marks.  Rather, we look to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion.

Id. (internal quotations and citations omitted).  See also Falwell, 420 F.3d at 316 ("[C]ourts . . . determine whether a likelihood of confusion exists by examin[ing] the allegedly infringing use in the context in which it is seen by the ordinary consumer.") (internal quotation and citation omitted).  The Fourth Circuit has identified "several nonexclusive factors" to be considered in determining whether there is a likelihood of confusion:

> (1) the strength or distinctiveness of the plaintiff's mark; (2) the similarity of the two marks; (3) the similarity of the goods or services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; and (7) actual confusion.

Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 259 (4th Cir. 2007) (citing Pizzeria Uno, 747 F.2d at 1527).  "These . . . factors are not always weighted equally, and not all

40

factors are relevant in every case." Id. at 260-61  "However, evidence of actual confusion is 'often paramount' in the likelihood of confusion analysis." George & Co., 575 F.3d at 393 (quoting Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 804 (4th Cir. 2001)). See also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 937 (4th Cir. 1995) (noting that the actual confusion factor is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion.").

The defendant did not address these elements in his response to the plaintiff's motion.  He did, however, challenge several of these elements in his first motion to dismiss, which was inappropriate for the purposes of such motion.  As the plaintiff is proceeding pro se, the undersigned will incorporate the applicable arguments from that motion into his response to the instant motion.

The first factor—a mark's strength or distinctiveness—focuses on the mark's strength.  The likelihood that consumers will be confused by competing uses of the mark is increased when a mark possesses a greater degree of strength.  Strength consists of a mark's distinctiveness and its commercial strength.  George & Co., 575 F.3d at 593.  The undersigned, elaborated upon infra, finds that the plaintiff's mark fits into the suggestive category of distinctiveness, a category strong enough to merit protection.  The mark also possesses a measurable quantum of commercial strength,

inasmuch as the plaintiff states that it has members in multiple states and annually raises over $100,000 for charitable causes. The defendant has presented no evidence or arguments regarding this element. Therefore, this factor weighs in favor of the plaintiff.

The second factor-similarity of the marks-also weighs in the plaintiff's favor. With the exception of the word "Nomads" that is added to the defendant's mark, the two word marks are identical. The two logos are also very similar. Both use concentric circles, with an eagle clinching at least one battle axe in the inner circle and the phrase "Brothers of the Wheel" in the outer circle. The defendant's mark also uses a yellow background in both circles, a color that is also the background of the inner circle of the plaintiff's mark.

In his first motion to dismiss, the defendant argues that similarity between the marks cannot be proven.

> Not only is there ambiguity in the USPTO's test for "likelihood of confusion," in that it does not explain if the concern about confusion, if there is any, is up close or from a distance. In either scenario in the matter before the court, the clear and "distinct" differences between the patches/logos of the two motorcycle clubs are more than obvious to anyone observing same . . . . It may be true that there are some similarities in the two marks however, as mentioned above, none that would cause anyone even the slightest amount of confusion. Observe the background color of both logos. They are very distinct (white versus yellow-gold- see exhibits).

ECF No. 5 at 2. However, this argument is without merit, even more so because the defendant even concedes that there are similarities. Moreover, the marks do not have to be exactly identical to be

similar.

The issue of similarity of services is also uncontestedly in the plaintiff's favor, as the defendant operates a motorcycle club, the same service as the plaintiff.

The next relevant factor is the defendant's intent, which also weighs in the plaintiff's favor. The defendant, as noted earlier, even admits that he intentionally used the plaintiff's mark as a basis for his own mark, although he then argues that intent cannot be proven.

> With regard to "intent[,]" the defendant was a member of
> the plaintiff's club for years and then retired. He then
> started a new club and it is only normal that he would
> consider at least some of the characteristics of the logo
> from his former club. In the end however, the two logos,
> as well as the "mission" of the two motorcycle clubs, are
> sufficiently different that intent to deceive by the
> defendant is not even likely, let alone provable, in this
> case. In the complaint itself the plaintiff, at no time,
> is able to show any "intent" to deceive[.]

Id. at 2. Hence, the defendant admits that, at the very least, he intentionally used the plaintiff's mark as an inspiration, even though doing so was in violation of his license to use the plaintiff's mark as a retired member. His argument that any intent on his part cannot be proven is without merit; his behavior constitutes a knowing and bad faith violation of the license he had as a retired member to use the plaintiff's marks.

Finally, there is the factor of actual confusion. As noted earlier, evidence of actual confusion in entitled to great weight. George & Co., 575 F.3d at 593. In the instant case, the plaintiff

43

has indeed presented evidence of actual confusion—namely, the email correspondence between the plaintiff and Mr. Bobby Brown that was attached to its Complaint and the affidavit from Mr. Carey attached to its motion for summary judgment, which stated that the defendant's actions have cost it membership dues, community goodwill, and services in the amount of $25,000.   In his first motion to dismiss the defendant argues that "[t]here is absolutely no evidence or trace of confusion."   However, such a statement alone is insufficient on summary judgment.   In its Order and Notice of July 20, 2011, the undersigned notified the defendant that he

> must set out either in his own affidavit or sworn statement, or the affidavits or sworn statements of other witnesses, specific facts that show that the plaintiff and defendant Mollohan actually disagree about one or more important facts present in this case. In the affidavits and exhibits, defendant Mollohan should address, as clearly as possible, the issues and facts stated in the Complaint and in the affidavits or other evidence submitted by the plaintiff.

ECF No. 18 at 1-2.   The defendant has failed to do so, providing the Court with zero affidavits or other evidence on this issue, and every other issue in this case.   Therefore, the factor of actual confusion is in the plaintiff's favor.

### Conclusion

There is no genuine issue of material fact as to the plaintiff's claim against the defendant for trademark infringement, in violation of 15 U.S.C. § 1114(1).   Even when considering the inferences that he is due on summary judgment, the defendant has

44

failed to make a sufficient evidentiary showing disputing that the plaintiff possesses a mark; that the defendant used the mark; that the defendant's use of the mark occurred "in commerce"; that the defendant used the mark in connection with the sale, offering for sale, distribution, or advertising of goods or services; and that the defendant used the mark in a manner likely to confuse consumers. Therefore, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact as to Count One of the plaintiff's Complaint, and that the plaintiff is entitled to judgment as a matter of law.

**Count Two**

As discussed above, Section 43(a) creates a cause of action against:

> [a]ny person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A). To prevail under a false designation of origin claim, the plaintiff must prove:

> (1) that it possesses a mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred "in commerce"; (4) that the [opposing party] used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the [opposing party] used

45

the mark in a manner likely to confuse consumers.
_Falwell_, 420 F.3d at 313.

As the elements of Counts One and Two are identical, the
summary judgment analysis for Count One, _supra_, equally applies to
Count Two; the undersigned accordingly incorporates that analysis
for Count Two. Out of an abundance of caution, however, the
undersigned will still examine whether the plaintiff's mark is
entitled to protection under Section 43(a) in the event that the
American flag contained therein were to invalidate its
registration; as stated earlier, Section 43(a) applies to
unregistered marks. The only extra analysis that needs to be done
is a determination of whether the plaintiff would still possess its
mark.

### The Plaintiff's Possession of a Mark

### Protectable Interest

An unregistered trademark must satisfy two requirements for
its owner to possess a protectable interest: the mark must be used
in commerce and it must be distinctive. _Societe des Bains de Mer_
_et du Cercle des Etrangers a Monaco_, 329 F.3d at 363 (citing _Sara_
_Lee Corp. v. Kayser-Roth Corp._, 81 F.3d 455, 464 (4th Cir. 1996)
(stating that the degree of protection a mark may receive is
directly related to its distinctiveness). Word marks are
classified into four categories of distinctiveness:

(1) generic, (2) descriptive, (3) suggestive, and (4)
arbitrary or fanciful. If a term is generic (the common

46

> descriptive name for a thing), it is ineligible for
> trademark protection. For the public has an inherent
> right to call a product by its generic name. If terms
> are fanciful (words invented solely for their use as
> trademarks), arbitrary (common words applied in
> unfamiliar ways), or suggestive (words partially
> descriptive and partially fanciful), the association
> between the mark and its source is presumed and the mark
> is eligible for trademark protection. But if a mark is
> merely descriptive, then proof of secondary meaning in
> the marketplace is required for the mark to be eligible
> for protection.

Perini Corp., 915 F.2d at 124-25 (primarily citing Abercrombie &

Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9-11 (2d Cir. 1976)

(Friendly, J.); other citations omitted).

If a mark stands for an idea which requires some operation of

the imagination to connect it with the goods, it is suggestive.

Pizzeria Uno, 747 F.2d at 1528. Arbitrary marks differ in that

> [they] are comprised of words in common usage, but,
> because they do not suggest or describe any quality,
> ingredient, or characteristic of the goods they serve,
> are said to have been arbitrarily assigned. Examples
> include Tea Rose® flour, Camel® cigarettes, and Apple®
> computers.

Sara Lee Corp., 81 F.3d at 464.

The plaintiff argues that its mark should be classified as

either arbitrary or suggestive. With regards to the latter

classification, the plaintiff argues that its "use of term

'Brothers of the Wheel' within the mark suggests at most an

association with motorcycling, but the mark is not 'descriptive' of

motorcycles because it 'requires the consumer to exercise the

imagination in order to draw a conclusion as to the nature of goods

and services.'"   ECF No. 17 at 13 (quoting <u>Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Texas</u>, 909 F. 2d 839, 845 (5th Cir. 1990).

The defendant did not address this particular issue in the response to the plaintiff's motion for summary judgment that he filed with the Court.   However, in his fourth motion to dismiss, ECF No. 20, he argues that the plaintiff cannot have a protectable interest because the mark is invalidated because of the American flag therein.   However, as reiterated earlier, Section 43(a) is not limited to registered marks.

The plaintiff's word mark of Brothers of the Wheel is best categorized as suggestive, inasmuch as some operation of the imagination is required to connect it with a motorcycle club. Given the connection between wheels and motorcycles, it is also not arbitrary.   As suggestive marks are entitled to protection, there is no genuine issue of material fact that the plaintiff possesses a protectable interest.

<u>**Ownership**</u>

"To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." <u>Emergency One, Inc.</u>, 332 F.3d at 267 (internal citations omitted).   When there are conflicting claimants to the right to use the same mark, the right

belongs to the first person to use it in connection  with the specified use.  Id. at 268 (internal citations omitted).

As stated in earlier greater detail, the plaintiff claims that its ownership of the mark is "beyond fair dispute," ECF No. 17 at 13, though the Court noted that the defendant registered his club with the State of Washington as a non-profit or charitable organization as far back as 2001 and 2002, dates that precede the plaintiff's registration with the USPTO.  However, as was the case with Count One, such registration with the State of Washington does ultimately not change the outcome of this matter, inasmuch as the plaintiff has uncontestedly been using its mark since 1977.

Therefore, there is no genuine issue of material fact that the plaintiff "owns" the mark in question.

### Conclusion

There is no genuine issue of material fact as to the plaintiff's claim against the defendant for false designation or origin, in violation of 15 U.S.C. § 1125.  Even when considering the inferences that he is due on summary judgment, the defendant has failed to make a sufficient evidentiary showing disputing that the plaintiff possesses a mark; that the defendant used the mark; that the defendant's use of the mark occurred "in commerce"; that the defendant used the mark in connection with the sale, offering for sale, distribution, or advertising of goods or services; and that the defendant used the mark in a manner likely to confuse

consumers.  Therefore, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact as to Count Two of the plaintiff's Complaint, and that the plaintiff is entitled to judgment as a matter of law.

**REMEDIES**

The undersigned will now separately address the issue of remedies due to the plaintiff in this case.

### Injunctive Relief

The Lanham Act gives the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to . . . prevent a violation under [Section 1125(a)]."  15 U.S.C. § 1116(a).  "Before an injunction may issue, however, the party seeking the injunction must demonstrate that (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of the hardships favors the party seeking the injunction; and (4) the public interest would not be disserved by the injunction."  PBM Products, LLC v. Mead Johnson & Co., 639 F.3d 111, 126 (4th Cir. 2011) (citing eBay, Inc. v. MercExchange, 547 U.S. 388, 391 (2006)).  "[T]he mere fact that a plaintiff may recover damages does not negate his right to injunctive relief."  Id. (citing Lyons P'ship, L.P., 243 F.3d at 801).  Of these elements, the most difficult one to demonstrate is irreparable injury.  Id.  While a Lanham Act plaintiff

50

need not even point to an actual loss or diversion of
sales . . . . [the plaintiff] must, however, offer
something more than a mere subjective belief that he is
likely to be injured . . . . [H]e must submit proof which
provides a reasonable basis for that belief. The
likelihood of injury and causation will not be presumed,
but must be demonstrated in some manner.

Id. at 127 (quoting Coca-Cola Co. v. Tropicana Products, Inc., 690

F.2d 312, 316 (2d Cir. 1982) See also Maker's Mark Distillery,

Inc. v. Diageo North America, Inc., 703 F. Supp.2d 671, 700

(stating, in a case involving dueling dripping red wax seals on

bottles of liquor, that "injunctive relief is the remedy of choice

for trademark and unfair competition cases, since there is no

adequate remedy at law for the injury caused by a defendant's

continuing infringement.") (quoting Audi AG v. D'Amato, 469 F.3d

534, 550 (6th Cir. 2006) (internal citation omitted)); 5 McCarthy

on Trademarks and Unfair Competition § 30:2 (4th ed.) ("Injunctive

relief does not require that injury be proven. In effect, injury

to the trademark owner is presumed.").

Moreover, "[i]t is well established that injunctive relief

should be no more burdensome to the defendant than necessary to

provide complete relief to the plaintiffs." Id. at 128 (quoting

Kentuckians for Commonwealth v. Rivenburgh, 317 F.3d 425, 436 (4th

Cir.2003) (quoting Califano v. Yamasaki, 442 U.S. 682, 702

(1979))).

The plaintiff addressed only a few of these requirements in

its motion for summary judgment and permanent injunction.

51

> [The presumption of injury] is buttressed here by the
> fact that Brothers of the Wheel M.C. Executive Council,
> Inc. has invested much time and money since 1977 in
> developing and advertising services under its "Brothers
> of the Wheel" marks throughout the country.  Allowing
> defendants to continue infringing that mark, especially
> on their website and as a domain name and keywords,
> deprives Brothers of the Wheel M.C. Executive Council,
> Inc. of the commercial benefit it intended to and is
> entitled to derive from that investment.  That loss
> increases each day that defendants' infringement is
> allowed to continue.

ECF No. 17 at 22.  The plaintiff further argues that the balance

of hardships is in its favor.

> The balance of hardships tips sharply in Brothers of the
> Wheel M.C. Executive Council, Inc. favor.  In contrast to
> the substantial injury that plaintiff is suffering from
> defendants' infringement, Brothers of the Wheel M.C.
> Executive Council, Inc. expects that discovery will show
> that until 2010, the only investment of any note that the
> Codefendant's made to promote their mark was the cost of
> taking out a domain name which used the plaintiff's name
> and the cost of making patches which is for all practical
> purposes identical to that of the Brothers of the Wheel
> M. C. Executive Council, Inc.  In his response to the
> Complaint, Mollohan admitted his past association with
> the Brothers of the Wheel M.C. Executive Council, Inc.
> strongly influenced his choice of name and logo for his
> alleged organization. Given that knowledge, any hardship
> that the defendants may encounter from discontinuing
> their use of their infringing marks, particularly on
> their website, is self-inflicted and should carry no
> weight in determining whether a preliminary injunction
> should issue.

Id. at 22-23

The defendant has not addressed the merits of an injunction

in any of his filings with the Court.

All four of the requirements for an injunction are present in

this case.  First, the plaintiff has satisfied the irreparable

injury requirement.   There is evidence of actual confusion, as stated earlier; it has suffered monetary losses, as testified to in the affidavit of Mr. Carey and not denied by the defendant; and its mark and association have become associated with the ne'er-do-well community of motorcycle nomads.   There is also an inadequate remedy at law, as it is evident that the defendant has no intention of ceasing his infringing behavior.   The balance of hardships also falls on the plaintiff's side.   It is the senior user of the mark, and has spent decades building up its name and reputation; any losses suffered by the defendant are his own fault, especially after he admittedly used the plaintiff's mark as his inspiration. The public would also not be disserved by the issuance of an injunction against the defendant.

Therefore, the undersigned proposes that the presiding District Judge **FIND** that an injunction mandating the equitable relief sought by the plaintiff is necessary in this case.   The defendant should be ordered to: (1) cease his use of the plaintiff's word mark or variations thereof, including the terms "Brothers of the Wheel" and acronym "botw"; (2) cease his use of the plaintiff's logo, and any logo bearing a similarity to the plaintiff's mark, including any logo containing an eagle within circles; (3) disclose the information of all of his confederates and applicable business partners; (4) cease any and all activities on the internet that use the terms "Brothers of the Wheel" and

"botw" or use the plaintiff's logo or variations thereof, as stated above; and (5) dissolve any government-registered entity that uses the plaintiff's mark in its name.  The undersigned further proposes that the presiding District Judge warn the defendant of the penalties for being in contempt of court if he fails to comply with any injunctive order.  To encourage compliance with an injunction, the defendant should be required to submit, within thirty days, a progress report detailing his compliance.  See 15 U.S.C. § 1116 ("Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction.").

**Damages**

Section 1117(a) of Title 15 states that, as to Lanham Act claims, a successful plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  These damages "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).  Moreover, Section 1117(b) permits a court to award treble damages in appropriate circumstances.  See 15 U.S.C. § 1117(b) ("In assessing damages under subsection (a) of this section, the court shall, unless the court finds extenuating

circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee[.]").

Six factors to consider in making a damages award include

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

Synergistic Intern., LLC v. Korman, 470 F.3d 162, 175 (4th Cir. 2006) (citing Quick Techs., Inc. v. Sage Group PLC, 313 F.3d 338, 349 (5th Cir. 2002)).

The first factor "addresses whether there has been a willful infringement on the trademark rights of the plaintiff, or whether the defendant has acted in bad faith." Id. "[A]lthough willfulness is a proper and important factor in an assessment of whether to make a damages award, it is not an essential predicate thereto. In other words, a lack of willfulness or bad faith should weigh against an award of damages being made, but does not necessarily preclude such an award." Id. (internal citation omitted).

However, attorney's fees may be awarded under Section 1117(a) only in "exceptional cases." Doughney, 263 F.3d at 370. "[A] case is 'exceptional' if the defendant's conduct was malicious, fraudulent, willful or deliberate in nature. In other words, a prevailing plaintiff must show that the defendant acted in bad

faith." <u>Id.</u> (internal quotations and citations omitted).

Factors warranting monetary damages are present in this case. Most importantly, there has been willful infringement by the defendant. The defendant is a past member of the plaintiff, and the defendant had previously been using the plaintiff's marks under a license. He admits that he used the plaintiff's marks in creating his own club, in derogation of the license. As the plaintiff's affidavit states that it has suffered monetary losses, an injunction is not sufficient to make the plaintiff whole. There has been no delay by the plaintiff in instituting this civil action, and the public interest favors damages as well. There are also no extenuating circumstances that would preclude treble damages. Therefore, the undersigned proposes that the presiding District Judge **FIND** that treble damages pursuant to Section 1117(a) are appropriate. Rather than propose a specific amount, the undersigned recommends that the parties be required to submit more detailed statements of profits, losses, and costs to the presiding District Judge before a damages award is calculated.

The undersigned also proposes that the presiding District Judge **FIND** that attorney's fees are warranted. The defendant is a past member of the plaintiff, and the defendant had previously been using the plaintiff's marks under a license. He admits that he used the plaintiff's marks in creating his own club, in derogation of the license and in bad faith. He has clearly created

56

exceptional circumstances warranting an award of attorney's fees.

### **Destruction of Infringing Materials**

> In any action arising under [the Lanham Act], in which a
> violation under section 43(a) [15 U.S.C. § 1125(a)] . .
> . shall have been established, the court may order that
> all labels, signs, prints, packages, wrappers,
> receptacles, and advertisements in the possession of the
> defendant, bearing the registered mark or, in the case of
> a violation of section 43(a) [15 U.S.C. § 1125(a)] . . .
> the word, term, name, symbol, device, combination
> thereof, designation, description, or representation that
> is the subject of the violation, or any reproduction,
> counterfeit, copy, or colorable imitation thereof, and
> all plates, molds, matrices, and other means of making
> the same, shall be delivered up and destroyed.

15 U.S.C. § 1118.   Therefore, the undersigned proposes that the presiding District Judge **FIND** that the defendant must deliver to the plaintiff all items containing the plaintiff's mark so that the plaintiff may destroy them.

### RECOMMENDATION

It is respectfully **RECOMMENDED** that the defendant's motions to dismiss [ECF Nos. 5, 13, 20, & 26] be **GRANTED** as to Counts Three, Four, Five, and Six and **DENIED** as to Counts One and Two, the plaintiff's motion for default judgment [ECF No. 14] be **DENIED**, the defendant's motion to deny plaintiff's motion for default judgment [ECF No. 15] be **GRANTED**, and the plaintiff's motion for summary judgment and permanent injunction [ECF No. 17] be **GRANTED** as to Counts One and Two.   In the alternative, it is **RECOMMENDED** that the plaintiff be given a period of time within which to re-plead Counts Three, Four, Five, and Six.   Further, it is **RECOMMENDED** that

57

the plaintiff be awarded injunctive relief, damages, attorney's fees, and property, as described above.  Finally, given the above recommendations, it is **RECOMMENDED** that the defendant's motion for court injunction(s) [ECF No. 24] be **DENIED** as **MOOT**.

The parties are notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendation" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendation" to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to Judge Johnston.

The Clerk is directed to mail a copy of this Proposed Finding and Recommendation to the defendant and to transmit it to counsel of record.

ENTER:     November 2, 2011

Mary E. Stanley
United States Magistrate Judge